**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1275
_____

CHESAPEAKE APPALACHIA, LLC

v.

SCOUT PETROLEUM, LLC;
SCOUT PETROLEUM II, LP,
                                        Appellants
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 4-14-cv-00620)
District Judge: Hon. Matthew W. Brann
_____

Argued October 8, 2015

BEFORE: SHWARTZ, KRAUSE,
and COWEN, <u>Circuit Judges</u>

(Opinion Filed: January 5, 2016)


Stewart L. Cohen, Esq.

Michael Coren, Esq.
Jacob A. Goldberg, Esq.
Alessandra C. Phillips, Esq.
Robert L. Pratter, Esq. (Argued)
Cohen, Placitella & Roth
2001 Market Street
Two Commerce Square, Suite 2900
Philadelphia, PA 19103

Thomas D. Kitch, Esq.
Daniel E. Lawrence, Esq.
David G. Seely, Esq.
Gregory J. Stucky, Esq.
Fleeson, Gooing Coulson & Kitch
301 North Main Street
1900 Epic Center
Wichita, KS 67202

Counsel for Appellants

Daniel T. Brier, Esq.
Myers, Brier & Kelly
425 Spruce Street
Suite 200
Scranton, PA 18503

Daniel T. Donovan, Esq. (Argued)
Ragan Naresh, Esq.
Kirkland & Ellis
655 15th Street, N.W.
Suite 1200

Washington, DC 20005

Counsel for Appellee

_____

OPINION OF THE COURT
_____

COWEN, <u>Circuit Judge</u>.

In <u>Opalinski v. Robert Half International Inc.</u>, 761 F.3d 326 (3d Cir. 2014), <u>cert. denied</u>, 135 S. Ct. 1530 (2015), we held that the availability of class arbitration constitutes a "question of arbitrability" to be decided by the courts—and not the arbitrators—unless the parties' arbitration agreement "clearly and unmistakably" provides otherwise, <u>id.</u> at 329, 335-36.

Scout Petroleum, LLC and Scout II, LP (collectively, "Scout") appeal from the orders of the United States District Court for the Middle District of Pennsylvania granting Chesapeake Appalachia, LLC's ("Chesapeake") motions for summary judgment and for an order vacating a decision by the arbitrators and denying Scout's own motion to dismiss the complaint as well its motion for reconsideration. The oil and gas leases ("Leases") at issue in this appeal state that, in the event of a disagreement between "Lessor" and "Lessee" concerning "this Lease," performance "thereunder," or damages caused by "Lessee's" operations, "all such disputes" shall be resolved by arbitration "in accordance with the rules

of the American Arbitration Association." (A247.)  Based on the language of the Leases themselves, the nature and contents of the various AAA rules, and the existing case law, we conclude that the Leases do not "clearly and unmistakably" delegate the question of class arbitrability to the arbitrators.  Accordingly, we will affirm.

## I.

In 2008, Chesapeake entered into various oil and gas leases with landowners in several northeastern Pennsylvania counties.  Chesapeake is the "Lessee," and the "Lessor" is (or originally was) the respective landowner, e.g., "[t]his Lease made this **10th** day of **January**, 2008, by and between: **William D. Bergey and Joanne M. Bergey, husband and wife** . . . hereinafter collectively called 'Lessor' and **CHESAPEAKE APPALACHIA, L.L.C.**, an Oklahoma limited liability company . . . hereinafter called 'Lessee.'" (A246.)  The Leases indicate that they were "prepared by" Chesapeake. (A248.)  In 2013, Scout purchased the right to several Leases, and, since then, it has been receiving royalties from Chesapeake.

The Leases include the following arbitration provision:

> **ARBITRATION.**  In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with

> the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

(A247.)

Over the years, the AAA has adopted and amended several rules applicable to various kinds of arbitration and mediation proceedings. Active Rules, American Arbitration Association, https://www.adr.org/aaa/faces/rules/searchrules/rulesearchresult?x_rule_status=A (last visited Nov. 10, 2015). The AAA website lists more than fifty sets of active rules, including the Commercial Arbitration Rules and Mediation Procedures ("Commercial Rules") as well as the Supplementary Rules for Class Arbitrations ("Supplementary Rules"). Id.

The AAA's "Commercial Arbitration and Mediation Procedures" publication is nearly fifty pages long and includes fifty-eight different "Commercial Rules." These rules are couched in terms of individual or "bilateral" arbitration proceedings as opposed to proceedings on behalf of a class. They also generally address basic procedural issues. For example, there are rules governing the requirements for filing demands and answers, mediation, the arbitration proceeding's locale, pre-hearing production of information, basic guidelines for how the hearing should be conducted, and the timing, form, and scope of the arbitrator's award. Commercial Rule 1 ("Agreement of Parties") provides in relevant part that:

5

**(a)** The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a Demand for Arbitration or Submission Agreement received by the AAA. Any disputes regarding which AAA rules shall apply shall be decided by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

(A93.) Commercial Rule 7 governs the "Jurisdiction" of the arbitrator:

**(a)** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the

arbitration agreement or to the arbitrability of any claim or counterclaim.

**(b)** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part.  Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract.  A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**(c)** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection.  The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

(A96.)  Commercial Rule 8 ("Interpretation and Application of Rules") states, inter alia, that the arbitrator "shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties."  (A97.)

The Supplementary Rules governing class arbitration went into effect in 2003.  Entitled "**Applicability**,"

7

Supplementary Rule 1 states:

> (a) These Supplementary Rules for Class Arbitrations ("Supplementary Rules") shall apply to any dispute arising out of an agreement that provides for arbitration pursuant to any of the rules of the American Arbitration Association ("AAA") where a party submits a dispute to arbitration on behalf of or against a class or purported class, and shall supplement any other applicable AAA rules. These Supplementary Rules shall also apply whenever a court refers a matter pleaded as a class action to the AAA for administration, or when a party to a pending AAA arbitration asserts new claims on behalf of or against a class or purported class.

> (b) Where inconsistencies exist between these Supplementary Rules and other AAA rules that apply to the dispute, these Supplementary Rules will govern. The arbitrator shall have the authority to resolve any inconsistency between any agreement of the parties and these Supplementary Rules, and in doing so shall endeavor to avoid any prejudice to the interests of absent members of a class or purported class.

> (c) Whenever a court has, by order, addressed and resolved any matter that would otherwise be decided by an arbitrator under these

Supplementary Rules, the arbitrator shall follow the order of the court.

(A136.) Supplementary Rule 3 is entitled "**Construction of the Arbitration Clause**":

> Upon appointment, the arbitrator shall determine as a threshold matter, in a reasoned, partial final award on the construction of the arbitration clause, whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class (the "Clause Construction Award"). The arbitrator shall stay all proceedings following the issuance of the Clause Construction Award for a period of at least 30 days to permit any party to move a court of competent jurisdiction to confirm or to vacate the Clause Construction Award. Once all parties inform the arbitrator in writing during the period of the stay that they do not intend to seek judicial review of the Clause Construction Award, or once the requisite time period expires without any party having informed the arbitrator that it has done so, the arbitrator may proceed with the arbitration on the basis stated in the Clause Construction Award. If any party informs the arbitrator within the period provided that it has sought judicial review, the arbitrator may stay further proceedings, or some part of them, until the arbitrator is informed of the ruling of the court.

9

> In construing the applicable arbitration clause, the arbitrator shall not consider the existence of these Supplementary Rules, or any other AAA rules, to be a factor either in favor of or against permitting the arbitration to proceed on a class basis.

(A137.) Under Supplementary Rule 4 ("**Class Certification**"), the arbitrator, if satisfied that the arbitration clause permits the arbitration to proceed as a class arbitration pursuant to Supplementary Rule 3, determines whether the proceeding should go forward as a class arbitration.

On March 17, 2014, Scout filed an arbitration demand against Chesapeake on behalf of itself and similarly situated lessors, alleging that Chesapeake paid insufficient royalties. In the answering statement it filed with the AAA, Chesapeake objected to class arbitration on the grounds that "[it] did not agree to resolve disputes arising out of the leases at issue in 'class arbitration,' nor did Chesapeake agree to submit the question of class arbitrability -- i.e., whether claimants may proceed on a class basis in arbitration -- to an arbitrator." (A1128.)

Chesapeake filed a declaratory judgment action on April 1, 2014. It specifically sought a judgment declaring that: (1) the District Court, and not the arbitrators, must decide whether class arbitration is available, which implicates the "who decides" question or inquiry; and (2) the Leases do not permit class arbitration, i.e., the so-called "clause

10

construction" inquiry. Scout asked Judge Brann to reassign the case to Judge Mannion of the Middle District of Pennsylvania. It claimed that Judge Mannion had already been assigned three related cases involving Chesapeake's oil and gas leases, including Chesapeake Appalachia, L.L.C. v. Burkett. This request was not granted. Chesapeake moved for summary judgment on the "who decides" question, and Scout filed a motion to dismiss the complaint (or, in the alternative, for a stay pending the completion of the arbitration).

On July 30, 2014, we issued our opinion in Opalinski. According to the District Court, the Opalinski Court changed the state of the law in this Circuit by holding, "for the first time, that 'the availability of classwide arbitration is a substantive "question of arbitrability" to be decided by a court absent clear agreement otherwise.'" Chesapeake Appalachia, L.L.C. v. Scout Petroleum, LLC, 73 F. Supp. 3d 488, 499 (M.D. Pa. 2014) (quoting Opalinski, 761 F.3d at 329).

It appears that the parties had agreed to the appointment of three retired federal judges as the AAA arbitration panel. On October 6, 2014, the arbitrators issued a decision entitled "**CLAUSE CONSTRUCTION DECISION RE: WHETHER A COURT OR THE PANEL MAY DECIDE CLASS ARBITRABILITY**." (A144.) Although they expressed some skepticism about our opinion in Opalinski, the arbitrators purportedly applied our holding that class arbitrability constitutes a gateway question for the courts to decide unless there is a clear agreement to the contrary. According to the arbitrators, "the arbitration

11

contract in this case clearly and unmistakably authorizes [them] to make the decision about arbitrability." (A149.) The arbitrators directed Scout and Chesapeake to brief the issue of whether the arbitration agreement precludes class arbitration.

Chesapeake filed motions to vacate the arbitrators' decision and to stay the arbitration proceeding until the District Court resolved Chesapeake's motions. The District Court entered an order on October 16, 2014, granting Chesapeake's motion for summary judgment and its motion to vacate the arbitrators' decision, denying Scout's motion to dismiss, and denying as moot Chesapeake's motion to stay. In particular, the District Court found the decision of the arbitrators "to be contrary to Opalinski." Chesapeake Appalachia, L.L.C. v. Scout Petroleum, LLC, No. 4:14-CV-0620, 2014 WL 5370683, at *1 (M.D. Pa. Oct. 16, 2014). "The next day, Judge Mannion of the Middle District entered an opinion concerning the same legal questions presented to the Court below, and under the same Chesapeake lease arbitration language, but reached the opposite result to the October 16, 2014 Order."[1] (Appellants' Brief at 8 (citing Chesapeake Appalachia LLC v. Burkett, Civil Action No.

---

[1] Chesapeake appealed from Judge Mannion's order (No. 14-4311). It appears that the parties in Burkett have reached a settlement in connection with another proceeding pending in the Middle District of Pennsylvania (Demchak Partners Ltd. P'ship v. Chesapeake Appalachia, L.L.C.). The Burkett appeal has been held in abeyance pending judicial approval of this settlement.

12

3:13-3073, 2014 WL 5312829 (M.D. Pa. Oct. 17, 2014)).) Scout filed a motion for reconsideration. It also moved to recuse Judge Brann and to vacate the October 16, 2014 order. On December 10, 2014, the District Court heard oral argument on these motions.

In a December 19, 2014 order, the District Court denied Scout's motions and amended its October 16, 2014 order to incorporate the District Court's memorandum opinion "issued today's date as the reasoning in support of that Order." (A36.) The District Court also certified this matter for appeal pursuant to 28 U.S.C. § 1292(b) and stayed the action pending appeal.

In its memorandum opinion, the District Court concluded that "[t]he contract here is silent or ambiguous as to class arbitration, far from the 'clear and unmistakable' allowance needed for an arbitrator, and not a court, to turn to the clause construction question." Scout, 73 F. Supp. 3d at 501. In reaching this conclusion, it relied in particular on this Court's opinion in Opalinski as well as the Sixth Circuit's decision in Reed Elsevier, Inc. v. Crockett, 734 F.3d 594 (6th Cir. 2013), cert. denied, 134 S. Ct. 2291 (2014). Judge Brann further explained that the approach adopted by Judge Mannion in Burkett "is not in accord with existing and binding case law." Scout, 73 F. Supp. 3d at 500.

On December 24, 2014, Scout filed a petition for permission to appeal under § 1292(b). This Court granted its petition on January 21, 2015. On March 4, 2015, Judge Keeley of the United States District Court for the Northern

13

District of West Virginia concluded in <u>Chesapeake Appalachia, LLC v. Suppa</u>, 91 F. Supp. 3d 853 (N.D. W. Va. 2015), that "[the court], not an arbitrator, will decide whether the parties agreed to classwide arbitration in the subject leases," <u>id.</u> at 864. In another Chesapeake oil and gas lease case, Northern District of West Virginia Judge Stamp reached the same conclusion. <u>Bird v. Turner</u>, Civil Action No. 5:14CV97, 2015 WL 5168575, at *7-*9 (N.D. W. Va. Sept. 1, 2015), <u>appeal filed</u>, No. 15-2152 (4th Cir. Sept. 30, 2015).

II.

The District Court possessed diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332.[2] This Court has appellate jurisdiction pursuant to § 1292(b) and 9 U.S.C. § 16.

We review de novo the District Court's orders granting

---

[2] Chesapeake and Scout Petroleum are limited liability companies, while Scout Petroleum II is organized as a limited partnership. We asked the parties to submit affidavits setting forth the citizenship of their respective members and partners. <u>See, e.g.</u>, <u>Zambelli Fireworks Mfg. Co. v. Wood</u>, 592 F.3d 412, 420 (3d Cir. 2010) (stating that citizenship of limited liability company is determined by citizenship of its members); <u>Swiger v. Allegheny Energy, Inc.</u>, 540 F.3d 179, 184-85 (3d Cir. 2008) (stating that citizenship of limited partnership is determined by citizenship of partners). In light of these sworn statements, we find that complete diversity exists in this matter.

14

Chesapeake's summary judgment motion and its motion to vacate the arbitrators' decision and denying Scout's motion to dismiss the complaint.  See, e.g., Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 265 (3d Cir. 2014), cert. denied sub nom. Allston v. Lower Merion Sch. Dist., 135 S. Ct. 1738 (2015); Opalinski, 761 F.3d at 330; Eid v. Thompson, 740 F.3d 118, 122 (3d Cir.), cert. denied, 135 S. Ct. 175 (2014).  Its order denying Scout's motion for reconsideration is reviewed for abuse of discretion.  See, e.g., N. River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1203 (3d Cir. 1995).

III.

Although enacted by Congress ninety years ago, the meaning and effects of the Federal Arbitration Act ("FAA") continue to generate a great deal of controversy.  Arbitration clauses are included in a wide variety of contracts, including consumer contracts, employment agreements, and oil and gas leases.  In turn, it often must be decided whether class arbitration is available under the parties' arbitration agreement.  In this appeal, we must determine "who" is to decide if the Leases permit class arbitration:  the courts or the arbitrators.

The availability of class arbitration implicates two questions or inquiries:  (1) the "who decides" inquiry; and (2) the "clause construction" inquiry.  As we recently explained in Opalinski, the "who decides" inquiry, in turn, consists of two basic components:

The analysis is twofold.  We decide whether the

15

availability of classwide arbitration is a "question of arbitrability." See Howsam v. Dean Witter Reynolds, Inc., [537 U.S. 79, 83] (2002) (internal quotation marks and citation omitted). If yes, it is presumed that the issue is "for judicial determination unless the parties clearly and unmistakably provide otherwise." Id. (internal quotation marks, citations, and alteration omitted). If the availability of classwide arbitration is *not* a "question of arbitrability," it is presumptively for the arbitrator to resolve. See First Options of Chi., Inc. v. Kaplan, [514 U.S. 938, 944-45] (1994).

Opalinski, 761 F.3d at 330. In the "clause construction" inquiry, the court or the arbitrator then decides whether the parties' arbitration agreement permits class arbitration. It is undisputed that Opalinski held "that the availability of classwide arbitration is a substantive 'question of arbitrability' to be decided by a court absent clear agreement otherwise." Id. at 329. However, the parties vigorously dispute whether or not the Leases clearly and unmistakably delegate this "question of class arbitrability" to the arbitrators.

"The burden of overcoming the presumption is onerous, as it requires express contractual language unambiguously delegating the question of arbitrability to the arbitrator." Id. at 335 (citing Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs, 357 F.3d 272, 280-81 (3d Cir. 2004)). Scout's entire approach can be summarized in the following terms: (1) the Leases expressly state that the

16

arbitration will be conducted in accordance with "the rules of the American Arbitration Association;" (2) under Pennsylvania law, the arbitration clause incorporates all of the AAA rules into the Leases, which "are part of the parties' agreement as if fully printed *in haec verba* therein" (Appellants' Brief at 27); and (3) the Commercial and Supplementary Rules, as integral parts of the Leases, thereby clearly and unmistakably vest the arbitrators with the jurisdiction to decide the question of class arbitrability. However, we agree with the District Court and Chesapeake that the Leases fail to satisfy this "onerous" burden.

Given the actual language of the Leases themselves, the nature and terms of the various AAA rules, and the existing case law, we determine that the District Court was correct when it concluded that the Leases are "far from the 'clear and unmistakable' allowance needed for" the arbitrators to decide the question of class arbitrability. Scout, 73 F. Supp. 3d at 501. We acknowledge that Scout offers one reasonable interpretation of the Leases. As a sophisticated business, Chesapeake could have (and, at least in retrospect, should have) drafted a clearer arbitration agreement. Nevertheless, it is not our role to ascertain whether one, among various competing interpretations of an arbitration agreement, is reasonable under ordinary principles of contractual interpretation, assess whether in hindsight a better arbitration agreement could have been written, or determine whether the arbitrators possess the power to decide other questions of arbitrability. Instead, the Court must determine whether the Leases clearly and unmistakably delegate the specific question of class arbitrability to the arbitrators. We

17

conclude that the Leases do not meet such an onerous burden.

**A.      Prior Case Law**

While it has split the district courts,[3] only two circuit

       [3] On the one hand, the <u>Suppa</u> court adopted (and expanded on) the District Court's reasoning in this case to conclude that "Chesapeake and the Defendants did not clearly and unmistakably agree to arbitrate the issue of class arbitrability." <u>Suppa</u>, 91 F. Supp. 3d at 864. In <u>Bird</u>, the district court, having considered the Chesapeake lease and its reference to the AAA rules, was "unconvinced that the parties intended to submit to the arbitrator the question of whether class arbitration is available." <u>Bird</u>, 2015 WL 5168575, at *9. There are additional decisions from district courts in this Circuit indicating that arbitration agreements referring to the AAA rules did not clearly and unmistakably delegate the question of class arbitrability to the arbitrators. <u>See</u> <u>Herzfeld v. 1416 Chancellor, Inc.</u>, Civil Action No. 14-4966, 2015 WL 4480829, at *5-*6 (E.D. Pa. Jul. 22, 2015), <u>appeal filed</u>, No. 15-2835 (3d Cir. Aug. 5, 2015); <u>Chassen v. Fidelity Nat'l Fin., Inc.</u>, Civil Action No. 09-291 (PGS) (DEA), 2014 WL 202763, at *6 (D.N.J. Jan. 17, 2014). On the other hand, Scout cites to a number of district court decisions (including Judge Mannion's opinion in <u>Burkett</u>) holding that such arbitration agreements did satisfy this "clear and unmistakable" standard. <u>See</u> <u>Marriott Ownership Resorts, Inc. v. Sterman</u>, Case No: 6:14-cv-1400-ORL-41TBS, at 5-10 (M.D. Fla. Jan. 16, 2015); <u>Marriott Ownership Resorts, Inc. v. Flynn</u>, Civil No. 14-00372 JMS-RLP, 2014 WL 7076827, at *7-*15 (D. Haw. Dec. 11, 2014); <u>Burkett</u>, 2014 WL 5312829, at *1-*9; <u>Medicine Shoppe Int'l, Inc. v. Edlucy, Inc.</u>, No. 4:12-CV-161 CAS, 2012 WL 1672489, at *1-*5 (E.D. Mo. May 15, 2012); <u>Bergman v. Spruce Peak Realty, LLC</u>, No.

19

courts have had the opportunity to consider the specific issue of whether an arbitration agreement referring to the AAA rules clearly and unmistakably delegated the question of class arbitrability to the arbitrators: (1) this Court in Opalinski; and (2) the Sixth Circuit in Reed Elsevier (and Huffman v. Hilltop Cos., 747 F.3d 391 (6th Cir. 2014)). While the Sixth Circuit indicated that such an agreement failed to meet this "clear and unmistakable" standard, our opinion in Opalinski did not address the effect of a reference to the AAA rules on this question. However, we did emphasize the onerous nature of overcoming the presumption in favor of judicial resolution of such questions of arbitrability—which requires express and unambiguous contractual language of delegation as opposed to mere silence or ambiguous contractual language.

Like this Court, the Sixth Circuit initially held that the question of whether an arbitration agreement permits class arbitration constitutes a gateway matter reserved for judicial resolution unless the parties clearly and unmistakably provide otherwise. Reed Elsevier, 734 F.3d at 597-99. "[G]uid[ed]" by Reed Elsevier's "persuasive" analysis, Opalinski, 761 F.3d at 334, we joined the Sixth Circuit in holding that the availability of class arbitration constitutes a question of arbitrability, id. at 335. The arbitration clause at issue in Reed Elsevier provided that any controversy, claim, or counterclaim arising out of or connected with the parties' contract will be resolved by binding arbitration under the

_____

2:11-CV-127, 2011 WL 5523329, at *2-*4 (D. Vt. Nov. 14, 2011); Yahoo! Inc. v. Iverson, 836 F. Supp. 2d 1007, 1010-12 (N.D. Cal. 2011).

20

arbitration provision and "'the then-current Commercial Rules and supervision of the American Arbitration Association.'" Reed Elsevier, 734 F.3d at 599. According to the Sixth Circuit, this language "does not clearly and unmistakably assign to an arbitrator the question whether the agreement permits classwide arbitration." Id. "Instead it does not mention classwide arbitration at all." Id. While it could be argued that the question of class arbitrability constituted a controversy arising in connection with the contract, the agreement—given the complete absence of any reference to class arbitration—"can just as easily be read to speak only to issues related to bilateral arbitration." Id. "Thus, at best, the agreement is silent or ambiguous as to whether an arbitrator should determine the question of classwide arbitrability; and that is not enough to wrest that decision from the courts." Id. (citing Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 684-85 (2010)). The Reed Elsevier court then conducted a "clause construction" analysis, concluding that the arbitration agreement did not provide for class arbitration. Id. at 599-600.

In Huffman, the Sixth Circuit applied the approach it set out in Reed Elsevier to an arbitration agreement providing for arbitration in accordance with the Commercial Rules as well as the AAA's Optional Procedures for Large, Complex Commercial Disputes. Huffman, 747 F.3d at 398. "The plaintiffs concede that Reed Elsevier is controlling authority. As was the case in Reed Elsevier, here the parties' agreement is silent as to whether an arbitrator or a court should determine the question of classwide arbitrability, meaning the determination lies with this court. See [Reed Elsevier, 734

21

F.3d at 599]." Huffman, 747 F.3d at 398.

Appellees Opalinski and McCabe filed a putative class action against their former employer, Appellant Robert Half International, Inc. ("RHI"), under the Fair Labor Standards Act. Opalinski, 761 F.3d at 329. The Opalinski Appellees' employment agreements included arbitration clauses stating that "'[a]ny dispute or claim arising out of or relating to Employee's employment, termination of employment or any provision of this Agreement' shall be submitted to arbitration." Id. According to our opinion, "[n]either agreement mentions classwide arbitration." Id. RHI moved to compel arbitration on an individual basis, and the district court, although it compelled arbitration, held that the propriety of classwide arbitration was to be decided by the arbitrator. Id. The arbitrator determined in a partial award that the employment agreements permitted class arbitration. Id. The district court denied RHI's motion to vacate the partial award. Id.

In Opalinski, "the question before us [was] who decides—that is, should the availability of classwide arbitration have been decided by the arbitrator or by the District Court?" Id. In other words, we considered "whether, in the context of an otherwise silent contract, the availability of classwide arbitration is to be decided by a court rather than an arbitrator." Id. at 330. Concluding that the district court must decide this question, we reversed the district court's orders and remanded for the district court to determine whether the employment agreements called for class arbitration. Id. at 335.

22

The Court recognized that, even though federal policy favors arbitration agreements, arbitration remains a matter of contract. Id. at 331. Because parties cannot be compelled to arbitrate any dispute they have not agreed to submit to arbitration, arbitrators possess the power to decide an issue only if the parties have authorized the arbitrator to do so. Id. "Because parties frequently disagree whether a particular dispute is arbitrable, courts play a limited threshold role in determining 'whether the parties have submitted a particular dispute to arbitration, *i.e.,* the "*question of arbitrability*."'" Id. (quoting Howsam, 537 U.S. at 83). Questions of arbitrability are limited to a narrow range of gateway issues, including whether the parties are bound by a given arbitration clause and whether an arbitration agreement applies to a particular type of controversy. Id. at 331. Questions that the parties would likely expect the arbitrator to decide are not questions of arbitrability. Id. These include procedural issues that grow out of the dispute and bear on the final disposition of the proceeding as well as allegations of waiver, delay, or similar defenses. Id. After a review of the prior Supreme Court and Third Circuit case law, we observed that whether the availability of class arbitration is a question of arbitrability "remains an open question." Id. at 332.

We held that the availability of classwide arbitration constitutes a question of arbitrability because it implicates "whose claims the arbitrator may adjudicate" as well as "what types of controversies the arbitrator may decide." Id. We emphasized the fundamental differences between bilateral and class arbitration and the serious consequences that arise from proceeding with one type rather than the other. Id. at

23

332-34. We also turned for support to the Sixth Circuit's ruling in Reed Elsevier, "[t]he only other Circuit Court of Appeals to have squarely resolved the 'who decides' issue." Id. at 334. We found its analysis to be "persuasive" and stated that it "guides our own." Id. Accordingly, this Court joined the Sixth Circuit in holding that the availability of class arbitration constitutes a question of arbitrability. Id. at 335.

The Opalinski Court then determined that (in the words of the accompanying heading) "[t]here is no evidence rebutting the presumption that the District Court should decide all questions of arbitrability." Id. (emphasis omitted). This section of our opinion consisted of two paragraphs. First, we explained why we made this determination:

> It is presumed that courts must decide questions of arbitrability "unless the parties clearly and unmistakably provide otherwise." Howsam, [537 U.S. at 83] (internal quotation marks and citation omitted). The burden of overcoming the presumption is onerous, as it requires express contractual language unambiguously delegating the question of arbitrability to the arbitrator. See [Major League Umpires], 357 F.3d at 280-81. Silence or ambiguous contractual language is insufficient to rebut the presumption. Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 154-55 (3d Cir. 2001). Here, Opalinski and McCabe's employment agreements provide for arbitration

24

of any dispute or claim arising out of or relating to their employment but are silent as to the availability of classwide arbitration or whether the question should be submitted to the arbitrator. Nothing else in the agreements or record suggests that the parties agreed to submit questions of arbitrability to the arbitrator. Thus, the strong presumption favoring judicial resolution of questions of arbitrability is not undone, and the District Court had to decide whether the arbitration agreements permitted classwide arbitration.

Id. at 335. In the next paragraph, we stated that the district court's orders were reversed and that the case was remanded for the district court to determine whether the employment agreements called for class arbitration. Id.

In the end, we offered the following conclusion:

"Arbitration is fundamentally a creature of contract, and an arbitrator's authority is derived from an agreement to arbitrate." [Puleo v. Chase Bank USA, N.A., 605 F.3d 172, 194 (3d Cir. 2010) (en banc)] (alteration in original) (internal quotation marks and citation omitted). Here, where we have an agreement to arbitrate individual disputes and no mention of arbitration for a wider group, we believe the parties would have expected a court, not an arbitrator, to determine the availability of class

25

arbitration. This is especially so given the critical differences between individual and class arbitration and the significant consequences of that determination for both whose claims are subject to arbitration and the type of controversy to be arbitrated. Hence we hold that the availability of class arbitration is a "question of arbitrability" for a court to decide unless the parties unmistakably provide otherwise.

Id. at 335-36.

Because Opalinski did not address the impact of incorporating the AAA rules, it is not binding Circuit precedent disposing of the issue of whether an arbitration agreement referring to the AAA rules clearly and unmistakably delegated the question of class arbitrability to the arbitrators. According to Chesapeake, "[t]his Court decided this very question (i.e., 'who decides' class arbitrability) on the same material facts (i.e., arbitration clauses incorporating the rules of the AAA but silent on class arbitration) and held that in these circumstances, courts, not arbitrators, decide class arbitrability." (Appellee's Brief at 12-13.) However, the Opalinski Appellees did not raise any kind of "incorporation" argument—at least until after we issued our opinion. In their unsuccessful petition for rehearing en banc, the Opalinski Appellees argued that the incorporation of the AAA rules constituted a clear and unmistakable expression of the parties' intent to leave the question of arbitrability to the arbitrator. Plaintiff-Appellees'

26

Petition for Re-Hearing *En Banc* at 9 & n.5, Opalinski, 761 F.3d 326 (No. 12-4444). But, by then, it was too late.[4] See, e.g., Peter v. Hess Oil V.I. Corp., 910 F.2d 1179, 1181 (3d Cir. 1990) (refusing to consider argument raised in rehearing petition but not in appellate briefing where no legitimate excuse was provided for failing to raise argument in timely fashion).

Nevertheless, we did hold (based in part on the Sixth Circuit's own ruling in Reed Elsevier) "that the availability of classwide arbitration is a substantive 'question of arbitrability' to be decided by a court absent clear agreement otherwise." Opalinski, 761 F.3d at 329. The Opalinski Court explained that "[t]he burden of overcoming the presumption is onerous, as it requires express contractual language unambiguously delegating the question of arbitrability to the arbitrator." Id. at 335 (citing Major League Umpires, 357 F.3d at 280-81). Accordingly, "[s]ilence or ambiguous contractual language is insufficient to rebut the presumption."

---

[4] The Opalinski Appellees subsequently addressed this "incorporation by reference" issue in their certiorari petition. See Petition for a Writ of Certiorari at 3 & n.2, Opalinski, 135 S. Ct. 1530 (No. 14-625). However, according to RHI, "Plaintiffs never argued the AAA incorporation issue in either the district court or before the Third Circuit," and they thereby waived the right to seek certiorari as to that issue. Opposition to Petition for a Writ of Certiorari at 19, Opalinski, 135 S. Ct. 1530 (No. 14-625). In any event, the Supreme Court denied the petition. See Opalinski, 135 S. Ct. 1530.

Id. (citing Deutz AG, 270 F.3d at 154-55).  We now must decide whether the Leases at issue in this appeal really satisfy this onerous burden.

## B.     The Leases and the AAA Rules

Having considered the language of the Leases, the nature and contents of the various AAA Rules, and the prior case law, we conclude that the Leases do not satisfy the onerous burden of overcoming the presumption in favoring of judicial resolution of the question of class arbitrability.

We look to the actual language of the Leases, setting aside for the moment Scout's "incorporation by reference" theory.  We find that the Leases are, at least in a certain sense, "silent as to the availability of classwide arbitration or whether the question should be submitted to the arbitrator." Opalinski, 761 F.3d at 335.  Like the arbitration agreements at issue in cases like Opalinski and Reed Elsevier, the Leases do not expressly mention class arbitration, the availability of class arbitration, the Supplementary Rules, "who decides"—the courts or the arbitrators—questions of arbitrability, or whether the arbitrators are to decide the availability of class arbitration under the Leases.  Id.; see also Reed Elsevier, 734 F.3d at 599 ("This language does not clearly and unmistakably assign to an arbitrator the question whether the agreement permits classwide arbitration.  Instead it does not mention classwide arbitration at all."); Bird, 2015 WL 5168575, at *9 ("The agreement does not mention class arbitration or arbitrability."); Herzfeld, 2015 WL 4480829, at *5 ("Here, the arbitration clause did not mention class or

28

collective action resolution."); Suppa, 91 F. Supp. 3d at 862 ("Like the arbitration clause in this case, however, [the clause in Opalinski] was silent with respect to class arbitration.").

We agree with Scout that, in order to undo the presumption in favor of judicial resolution, an arbitration agreement need not include any special "incantation" (like, for example, "the arbitrators shall decide the question of class arbitrability" or "the arbitrators shall decide all questions of arbitrability"). It appears that the concept of "silence" was first used in the "clause construction" context. In Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. 662 (2010), the parties "stipulated that the arbitration clause was 'silent' with respect to class arbitration," id. at 668. "Counsel for AnimalFeeds explained to the arbitration panel that the term 'silent' did not simply mean that the clause made no express reference to class arbitration. Rather, he said, '[a]ll the parties agree that when a contract is silent on an issue there's been no agreement that has been reached on that issue.'" Id. at 668-69 (citation omitted); see also, e.g., Oxford Health Plans LLC v. Sutter, 133 S. Ct. 2064, 2069 (2013) ("The parties in Stolt-Nielsen had entered into an unusual stipulation that they had never reached an agreement on class arbitration." (citing Stolt-Nielsen, 559 U.S. at 668-69)). In our opinion in Sutter v. Oxford Health Plans LLC, 675 F.3d 215 (3d Cir. 2012), aff'd, 133 S. Ct. 2064 (2013), we explained that "Stolt-Nielsen did not establish a bright line rule that class arbitration is allowed only under an arbitration agreement that incants 'class arbitration' or otherwise expressly provides for aggregate procedures," id. at 222 (citing Stolt-Nielsen, 130 S. Ct. at 1776 n.10; Jock v. Sterling

29

Jewelers Inc., 646 F.3d 113, 124 (2d Cir. 2011)).  Instead, the Supreme Court established a default rule under which a party may not be compelled to submit to class arbitration unless there is a contractual basis to conclude that the party actually agreed to do so.  Id.; see also, e.g., Oxford Health Plans, 133 S. Ct. at 2070 ("Nor, we continued, did the panel attempt to ascertain whether federal or state law established a 'default rule' to take effect absent an agreement." (quoting Stolt-Nielsen, 559 U.S. at 673)).  We also rejected the suggestion that an arbitration provision is "silent" whenever the words "class arbitration" are not written into the text of the provision itself.  Sutter, 675 F.3d at 222 n.5.  "[J]ust as '[t]he Supreme Court has never held that a class arbitration clause must explicitly mention that the parties agree to class arbitration in order for a decisionmaker to conclude that the parties consented to class arbitration, [Yahoo!, 836 F. Supp. 2d at 1011],'" the parties' failure to use a specific set of words does not automatically bar the courts from finding that the agreement clearly and unmistakably delegated the question of class arbitrability.  Burkett, 2014 WL 5312829, at *4.

Nevertheless, both the "who decides" and "clause construction" inquiries still impose basic standards that must be satisfied.  As a practical matter, the absence of an "incantation"—or the lack of any express reference to class arbitration, the availability of class arbitration, the Supplementary Rules, or who decides whether the arbitration agreement permits class arbitration—makes it more difficult to meet such burdens.  As we also recognized in Sutter, the requisite contractual basis may not be inferred solely from the

30

fact that the parties agreed to arbitrate or from their failure to prohibit this form of arbitration in their agreement. Sutter, 675 F.3d at 221, 224. "'[T]he differences between bilateral and class-action arbitration are too great for arbitrators to presume . . . that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings.'" Id. at 221 (quoting Stolt-Nielsen, 130 S. Ct. at 1776). "It follows that the parties' silence on the question of 'who decides' class arbitrability should not be read as implicitly consenting to submit the question to an arbitrator." Suppa, 91 F. Supp. 3d at 864. In fact, the burden that must be met in the present "who decides" context appears even more "onerous" than the equivalent burden applicable to the "clause construction" phase. After all, "[s]ilence or ambiguous contractual language" is not enough; the burden of overcoming the presumption "requires express contractual language unambiguously delegating the question of arbitrability to the arbitrator." Opalinski, 761 F.3d at 335 (citations omitted).

"[G]iven the total absence of any reference to classwide arbitration," the Leases "can just as easily be read to speak only to issues related to bilateral arbitration." Reed Elsevier, 734 F.3d at 599. We find it significant that the Leases consistently use singular (and defined) terms to describe the respective parties to any arbitration proceeding and the dispute to be arbitrated. The Leases provide that, where there is a disagreement between "Lessor" and "Lessee" concerning "this Lease," performance "thereunder," or damages caused by "Lessee's" operations, "all such disputes" shall be resolved by arbitration "in accordance with the rules

31

of the American Arbitration Association." (A247.) Each "Lease" defines the "Lessor" (e.g., "**William D. Bergey and Joanne M. Bergey, husband and wife**") as well as the "Lessee" ("**CHESAPEAKE APPALACHIA, L.L.C.**"). (A246.) According to Chesapeake, these terms clearly indicate that the parties only intended bilateral arbitration. While Chesapeake may have thereby intended to arbitrate all disagreements with each "Lessor," the current inquiry implicates a putative class of "Lessors," a group that (as the Suppa court noted) the Leases themselves never mention. Suppa, 91 F. Supp. 3d at 864.

Scout indicates that this language has no relevance to the present "who decides" inquiry. While Chesapeake criticizes Scout for (as the District Court put it) "skip[ping] directly to the clause construction question in order to answer the threshold 'who decides' question," Scout, 73 F. Supp. 3d at 500, Scout claims that it is Chesapeake and the District Court that have ventured into the "clause construction" inquiry. We recognize that the "who decides" and the "clause construction" questions represent separate inquiries, and we do not express any opinion as to whether or not the Leases permit class arbitration. However, the fact that specific terminology or a particular line of reasoning may be relevant to the "clause construction" inquiry (and we do not consider at this juncture how this inquiry should be conducted or its outcome) does not mean that this language or reasoning has no bearing whatsoever on the threshold "who decides" inquiry. For example, Opalinski relied on the agreements' "silen[ce] as to the availability of classwide arbitration" to conclude that the strong presumption favoring judicial

32

resolution of questions of arbitrability was not undone. Opalinski, 761 F.3d at 335; see also, e.g., Reed Elsevier, 734 F.3d at 599 ("But given the total absence of any reference to classwide arbitration in this clause, the agreement here can just as easily be read to speak only to issues related to bilateral arbitration."). Scout also insists that, under Sutter, "the incantation of 'class arbitration' in an arbitration agreement is not necessary to permit class arbitration." (Appellants' Brief at 35 (citing Sutter, 675 F.3d at 222).) However, Sutter and Stolt-Nielsen were "clause construction" rulings. See, e.g., Oxford Health Plans, 133 S. Ct. at 2068 n.2 ("We would face a different issue if Oxford had argued below that the availability of class arbitration is a so-called 'question of arbitrability.'"); Stolt-Nielsen, 559 U.S. at 680 ("But we need not revisit that question here because the parties' supplemental agreement expressly assigned this issue to the arbitration panel, and no party argues that this assignment was impermissible."). We nevertheless have looked to these "clause construction" cases for guidance in answering the "who decides" question. We do the same with respect to other considerations relevant to the current inquiry, including express contractual language referring to a singular "Lessor," "Lessee," and "Lease."

In light of the actual language of the Leases, Scout quite understandably emphasizes the contractual reference to arbitration "in accordance with the rules of the American Arbitration Association" (A247), the AAA rules, and the general contractual doctrine of incorporation by reference. Courts usually apply ordinary state law principles governing contract formation to decide whether the parties agree to

33

arbitrate a certain matter.  See, e.g., First Options, 514 U.S. at 944.   It is uncontested that, under Pennsylvania law, "[i]ncorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship."  Std. Bent Glass Corp. v. Glassrobots Oy, 333 F.3d 440, 447 (3d Cir. 2003) (footnote omitted).

Nevertheless, the general rule that courts should apply ordinary state law principles is subject to the following qualification: "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."  First Options, 514 U.S. at 944 (quoting AT&T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 649 (1986)).  Accordingly, it is not enough for Scout to establish that the AAA rules provide for the arbitrators to decide, inter alia, the question of class arbitrability, and that, in turn, these rules are incorporated by reference pursuant to state law.  It instead must present "clear and unmistakable evidence" of an agreement to arbitrate this specific question.  As we explained in Opalinski, the onerous burden of overcoming the presumption requires express contractual language unambiguously delegating the question—not mere silence or ambiguous contractual

language.[5]  See, e.g., Opalinski, 761 F.3d at 335.

Scout argues that the reference in the Leases to "the rules of the American Arbitration Association" is express contractual language incorporating the content of the Commercial Rules and the Supplementary Rules into the contract and serves as a clear and unmistakable delegation of authority to the arbitrators to decide class arbitrability.  We, however, agree with Chesapeake that this case implicates "a daisy-chain of cross-references"—going from the Leases themselves to "the rules of the American Arbitration Association" to the Commercial Rules and, at last, to the Supplementary Rules.  (Appellees' Brief at 31.)  Having examined the various AAA rules, we believe that the Leases still fail to satisfy the onerous burden of undoing the presumption in favor of judicial resolution of the question of class arbitrability.

---

[5]  Scout turns for support to the Supreme Court's December 14, 2015 decision in DIRECTV, Inc. v. Imburgia, ---- S. Ct. ---, 2015 WL 8546242 (2015).  The DIRECTV Court concluded that a California court's refusal to enforce an arbitration agreement "does not rest 'upon such grounds as exist . . . for the revocation of any contract.'"  Id. at *2 (quoting 9 U.S.C. § 2).  The Supreme Court did not consider whether the parties' agreement delegated a question of arbitrability to the arbitrators, and it did not call into question the well-established rule that courts should not assume that the parties agree to arbitrate arbitrability without "'clear and unmistakbl[e]' evidence that they did so."  First Options, 514 U.S. at 944 (quoting AT&T Techs., 475 U.S. at 649).

Initially, the Leases simply refer, without further explanation, to "the rules of the American Arbitration Association." (A247.) In other words, "[their] reference to the AAA rules is the only link to the submission of arbitrability issues to the arbitrator." Bird, 2015 WL 5168575, at *9. Founded in 1926, the AAA has adopted (and amended) numerous rules over many years. The AAA website identifies more than fifty sets of rules. Active Rules, supra. These range from the "AAA Dispute Resolution Board Hearing Rules and Procedures" to the "Supplementary Rules for Fixed Time and Cost Construction Arbitration." Id. In turn, the Leases at issue in this case do not expressly refer to the specific "Supplementary Rules" governing class arbitrations or the general "Commercial Rules." See, e.g., Herzfeld, 2015 WL 4480829, at *6 ("[W]e cannot find the three-word reference to AAA 'rules and regulations' incorporates a panoply of collective and class action rules applied by AAA once the matter is properly before the arbitrators by consent or waiver.").

While Commercial Rule 7 expressly grants the arbitrator the power to rule on objections concerning the arbitrability of any claim (and Commercial Rule 8 states that the arbitrator shall interpret and apply the rules insofar as they relate to the arbitrator's powers and duties), the Commercial Rules do not mention either class arbitration or the question of class arbitrability. The AAA's "Commercial Rules and Mediation Procedures" publication is nearly fifty pages long and includes fifty-eight different "Commercial Rules." Like the Leases and their references to a singular "Lessor," "Lessee," and "Lease," these rules are couched in terms of

36

bilateral arbitration proceedings. In addition, they address various procedural matters. Commercial Rule 4, for example, governs "Filing Requirements," e.g., "[a]rbitration under an arbitration provision in a contract shall be initiated by the initiating party ('claimant') filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of the applicable arbitration agreement from the parties' contract which provides for arbitration." (A94.) Likewise, Commercial Rule 5 ("Answers and Counterclaims") provides, inter alia, that "[a] respondent may file an answering statement with the AAA within 14 calendar days after notice of the filing of the Demand is sent by the AAA." (A95.) The Commercial Rules also address, among other things, when mediation is required, the locale for the arbitration, pre-hearing production of information, basic principles for how the hearing should be conducted, and the timing, form, and scope of the arbitrator's award. These are the basic procedural issues that, as we noted in Opalinski, "the parties would likely expect the arbitrator to decide." Opalinski, 761 F.3d at 331 (citation omitted). In contrast, the question of class arbitrability "is a substantive gateway question rather than a procedural one." Id. at 335.

Given the actual contractual language at issue here as well as the language and nature of the other AAA rules, the Supplementary Rules are not enough for us to conclude that the Leases clearly and unmistakably delegate the question of class arbitrability to the arbitrators. Under Supplementary Rule 1, the Supplementary Rules apply where a party submits a dispute on behalf of a purported class, and Supplementary Rules 3 and 4 indicate that the arbitrator must determine

whether the arbitration agreement permits class arbitration.[6] But, before we can even consider these Supplementary Rules, the "daisy-chain" takes us from the Leases to the otherwise unspecified "rules of the American Arbitration Association" to the Commercial Rules. The Commercial Rules do not even refer to the Supplementary Rules and are phrased in terms of basic procedural issues arising out of bilateral arbitration proceedings.

Because they are susceptible to more than one reasonable interpretation, the Leases do not include the

---

[6] Chesapeake argues that Supplementary Rule 3 refutes Scout's argument because it states that, "[i]n construing the applicable arbitration clause, the arbitrator shall not consider the existence of these Supplementary Rules, or any other AAA rules, to be a factor either in favor of or against permitting the arbitration to proceed on a class basis." (A137.) This aspect of the rule, however, implicates the "clause construction" inquiry. While the Sixth Circuit relied on this language, it did so in order to determine whether the parties' arbitration agreement authorized class arbitration (and not to answer the threshold "who decides" question). See Reed Elsevier, 734 F.3d at 599-600 ("Crockett responds that the arbitration clause refers to the AAA's Commercial Rules, which themselves incorporate the AAA's Supplemental Rules for Class Arbitration. But the Supplemental Rules expressly state that one should 'not consider the existence of these Supplementary Rules, or any other AAA rules, to be a factor either in favor of or against permitting the arbitration to proceed on a class basis.'").

required "express contractual language unambiguously delegating the question of [class] arbitrability to the arbitrator[s]." Opalinski, 761 F.3d at 335 (citation omitted). While it is reasonable to interpret the Leases, together with the Commercial Rules (especially Commercial Rule 7) and the Supplementary Rules (specifically Supplementary Rule 3), as granting the arbitrators the power to decide whether class arbitration is available, that is not the only reasonable interpretation. For instance, what if we were to assume that a landowner and an energy company intended to delegate to the arbitrator questions of arbitrability arising out of a bilateral arbitration proceeding between these two parties (i.e., "questions of bilateral arbitrability")—but not the question of class arbitrability? Wouldn't it be reasonable for the parties to draft an arbitration agreement that contains no reference whatsoever to class arbitration, the question of class arbitrability, or the Supplementary Rules but instead provides for arbitration "[i]n the event of a disagreement between Lessor and Lessee concerning this Lease" pursuant to "the rules of the American Arbitration Association"? Or perhaps the parties simply intended for the courts to decide both questions of bilateral arbitrability as well as the question of class arbitrability, consistent with the general presumption in favor of judicial resolution of such questions?

According to Scout, Chesapeake is asking us to adopt an unprecedented approach that would be inconsistent with well-settled "incorporation" principles. We acknowledge that it was Chesapeake that drafted the Leases. As a sophisticated business, it could have, and, at least in retrospect, should have, drafted a clearer arbitration agreement. However, we

must construe ambiguity against Scout and in Chesapeake's favor because "[i]t is presumed that courts must decide questions of arbitrability 'unless the parties clearly and unmistakably provide otherwise.'" Id. (citation omitted). "The burden of overcoming the presumption is onerous[.]" Id. (citation omitted). We cannot find that this onerous burden has been met merely because Chesapeake failed, for example, "to insert words of limitation or an express waiver of class arbitration" (Appellants' Reply Brief at 15 (citations omitted)). In fact, such a finding would (as the Suppa court aptly observed) "turn[ ] the presumption favoring judicial determination of classwide arbitrability on its head." Suppa, 91 F. Supp. 3d at 864. "The entire point of the presumption is that an arbitration clause need not expressly exclude questions of arbitrability as outside its scope . . . ." Id. (citation omitted).

It appears that "[v]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." Oracle Am., Inc. v. Myriad Grp. A.G., 724 F.3d 1069, 1074 (9th Cir. 2013) (citing Petrofac, Inc. v. DynMcDermott Petroleum Operations Co., 687 F.3d 671, 675 (5th Cir. 2012); Fallo v. High-Tech Inst., 559 F.3d 874, 878 (8th Cir. 2009); Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366, 1373 (Fed. Cir. 2006); Terminix Int'l Co. v. Palmer Ranch LP, 432 F.3d 1327, 1332 (11th Cir. 2005); Contec Corp. v. Remote Solution Co., 398 F.3d 205, 208 (2d Cir. 2005)). Like the District Court and Chesapeake, however, we believe that this "bilateral arbitration dispute case law" is entitled to relatively

little weight in the class arbitrability context. Scout, 73 F. Supp. 3d at 500. Devoting several pages of its appellate briefing to these bilateral arbitration cases, Scout argues that the incorporation of the AAA rules constitutes clear and unmistakable evidence of intent to delegate authority to the arbitrators to decide all questions of arbitrability, including the specific question of class arbitrability. However, the whole notion of class arbitration implicates a particular set of concerns that are absent in the bilateral context. Although it ultimately chose to rely on these cases, the Burkett court admitted that "the above cases do not address the exact issue presented in this action," i.e., "'who decides' class arbitrability." Burkett, 2014 WL 5312829, at *7 (footnote omitted) (citation omitted). In concluding that the availability of class arbitration constitutes a question of arbitrability, we turned in Opalinski to Supreme Court rulings highlighting the fundamental differences between bilateral arbitration and class arbitration as well as the serious consequences of permitting a class arbitration proceeding to go forward:

> "[(1) a]n arbitrator . . . no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties . . . [; (2) ] the presumption of privacy and confidentiality that applies in many bilateral arbitrations [does] not apply in class arbitrations[,] thus potentially frustrating the parties' assumptions when they agreed to arbitrate[; (3) t]he arbitrator's award no longer purports to bind just the parties to a single

41

> arbitration agreement, but adjudicates the rights of absent parties as well[; and (4) ] the commercial stakes of class-action arbitration are comparable to those of class-action litigation, even though the scope of judicial review is much more limited."

Opalinski, 761 F.3d at 333 (quoting Stolt-Nielsen, 559 U.S. at 686-87); see also, e.g., id. at 333 ("Additionally, as Justice Alito warned in his concurrence in Oxford Health, courts should be wary of concluding that the availability of classwide arbitration is for the arbitrator to decide, as that decision implicates the rights of absent class members without their consent." (citing Oxford Health Plans, 133 S. Ct. at 2071-72 (Alito, J., concurring)). "In AT&T Mobility LLC v. Concepcion, [131 S. Ct. 1740 (2011)], the Court similarly emphasized that the 'changes brought about by the shift from bilateral arbitration to class-action arbitration are fundamental,' concluding that '[a]rbitration is poorly suited to the higher stakes of class litigation' and that classwide arbitration *'is not arbitration as envisioned by the FAA.'*" Opalinski, 761 F.3d at 333-34 (quoting Concepcion, 131 S. Ct. at 1750, 1751-53). The legislative history of the FAA—which predates the adoption of Federal Rule of Civil Procedure 23, which governs class actions, by decades—"contains nothing . . . that contemplates the existence of class arbitration." Concepcion, 131 S. Ct. at 1749 n.5. Given these considerations, it is conceivable that a landowner and energy company may have agreed to the Leases because they intended to delegate questions of bilateral arbitrability to the arbitrators—as opposed to the distinctive question of whether

42

they thereby agreed to a fundamentally different type of arbitration not originally envisioned by the FAA itself.

Like the Burkett court, Scout asserts that consent to any of the AAA's rules constitutes consent to the Supplementary Rules and that, if a dispute subject to arbitration under these rules involves a purported class, the arbitration must be governed by all the rules, including the Supplementary Rules. Burkett, 2014 WL 5312829, at *7. In Reed v. Florida Metropolitan University, Inc., 681 F.3d 630 (5th Cir. 2012), abrogated in part on other grounds, Oxford Health Plans LLC v. Sutter, 133 S. Ct. 2064 (2013), the Fifth Circuit refrained from deciding whether the issue of class arbitration constitutes a question of arbitrability, id. at 633-36. It did so because, among other things, it believed that "the parties' agreement to the AAA's Commercial Rules also constitutes consent to the Supplementary Rules," id. at 635 (footnote omitted), and, given the substance of Supplementary Rule 3, "[t]he parties' consent to the Supplementary Rules, therefore, constitutes a clear agreement to allow the arbitrator to decide whether the party's agreement provides for class arbitration," id. at 635-36. However, we once again note that the current inquiry requires us to determine whether the Leases clearly and unmistakably delegate the question of class arbitrability to the arbitrators—and not merely whether the parties have somehow

43

"consented" to the Supplementary Rules.[7]

Finally, we find it significant that the Sixth Circuit held that an agreement referring to the AAA rules did not meet the "clear and unmistakable" standard. Admittedly, the Reed Elsevier court did not provide a detailed analysis in

---

[7] Furthermore, it appears that the parties in Reed did not dispute the applicability of the Supplementary Rules. Reed, 681 F.3d at 635 n.5 ("The School, in its motion to vacate the clause construction award, in fact represented to the district court that it had agreed to those Rules." (citation omitted)).

In a footnote, the Eleventh Circuit also refrained from deciding whether the availability of class arbitration is a question of arbitrability because the appellant "gave the question of whether the contract allowed for class arbitration to the arbitrator through its choice of rules and by failing to 'dispute th[e] [a]rbitrator's jurisdiction to decide this threshold issue.'" Southern Commc'ns Servs., Inc. v. Thomas, 720 F.3d 1352, 1359 n.6 (11th Cir. 2013) (citation omitted), cert. denied, 134 S. Ct. 1001 (2014). The parties agreed to arbitration pursuant to the AAA's Wireless Industry Arbitration Rules. Id. at 1355. Like the Fifth Circuit, the Eleventh Circuit did not reference the "onerous" burden that applies in the current context (and also relied on the party's conduct in the proceeding).

support of its holding.[8]  See, e.g., Burkett, 2014 WL 5312829, at *7 ("Further, in considering the arbitration clause in Reed [Elsevier], the Sixth Circuit looked only to whether there was an express reference to class arbitration in the arbitration clause.").  But, given our examination of both the language of the Leases and the nature and contents of the various AAA rules, we see no reason to reach a different conclusion in this case—and create a circuit split.  After all, we "join[ed] the

---

[8] As Scout points out, the Reed Elsevier court did not quote from or expressly examine the various AAA rules until it conducted its "clause construction" analysis.  In fact, the court never specifically mentioned Commercial Rule 7.  Scout further insists that the Sixth Circuit mischaracterized Supplementary Rule 3.  According to Scout, the circuit court overlooked the first sentence of the rule (which states that "the arbitrator" shall determine whether the arbitration clause permits the arbitration to proceed on behalf of a class) and misstates the final sentence of the rule (providing that, in construing the applicable arbitration clause, "the arbitrator" shall not consider the existence of the Supplementary Rules to be a factor either for or against permitting class arbitration).  The Sixth Circuit observed that "the Supplemental Rules expressly state that one should 'not consider the existence of these Supplementary Rules, or any other AAA rules, to be a factor either in favor of or against permitting the arbitration to proceed on a class basis.'"  Reed Elsevier, 734 F.3d at 599-60.  We do not see how the Sixth Circuit's use of the term "one" in place of "the arbitrator" in the "clause construction" context casts doubt on its prior determination that the question of class arbitrability must be decided by the court.

45

Sixth Circuit Court of Appeals in holding that the availability of class arbitration is a 'question of arbitrability.'" Opalinski, 761 F.3d at 335. In this appeal, we likewise conclude that the Leases do "not clearly and unmistakably assign to an arbitrator the question whether the agreement permits classwide arbitration." Reed Elsevier, 734 F.3d at 599.

## C. The Relief Granted

The District Court granted Chesapeake's motions for summary judgment and for the vacatur of the arbitrators' decision and denied Scout's motions to dismiss and for reconsideration. Scout specifically contends that the District Court committed reversible error by vacating the arbitrators' decision holding that the Leases clearly and unmistakably authorize them to decide the question of class arbitrability. Nevertheless, we have determined that the Leases do not clearly and unmistakably delegate this question to the arbitrators. According to Scout, "the Supreme Court in [Oxford Health Plans] wrote that a court may review an arbitrator's determination *de novo* only **absent** 'clear and unmistakable' evidence that the parties wanted an arbitrator to resolve the dispute." (Appellants' Reply Brief at 18 (citing Oxford Health Plans, 133 S. Ct. at 2068 n.2; Appellees' Brief at 12).) Given the absence of "clear and unmistakable" evidence in this case, the District Court appropriately granted the motion to vacate.

IV.

We will affirm the orders of the District Court.

46