SEYMOUR, Circuit Judge.
This case involves an arbitration proceeding between DISH Network L.L.C. ("DISH") and Matthew Ray, a former employee who signed an arbitration agreement when he was employed. The arbitrator determined that the Arbitration Agreement between the two parties permitted classwide arbitration, and then stayed the arbitration to permit DISH to contest the issue in court. DISH filed a Petition to Vacate Clause Construction Arbitration Award, which the district court denied. We affirm.
I.
Matthew Ray worked as a sales associate for DISH until his termination in 2015. When he was employed, Mr. Ray signed an Arbitration Agreement drafted by DISH, which provided the following:
[T]he Employee and DISH agree that any claim, controversy and/or dispute between them, arising out of and/or in any way related to Employee's application for employment, employment and/or termination of employment, whenever and wherever brought, shall be *1242 resolved by arbitration. The Employee agrees that this Agreement is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., and is fully enforceable.
... The arbitration shall be governed by and construed in accordance with the substantive law of the State in which the Employee performs services for DISH as of the date of the demand for arbitration, or in the event the Employee is no longer employed by DISH, the substantive law of the State in which the Employee last performed services for DISH. A single arbitrator engaged in the practice of law from the American Arbitration Association ("AAA") shall conduct the arbitration under the then current procedures of the AAA's National Rules for the Resolution of Employment Disputes ("Rules").
Aplt. App. at 51 (emphasis added).
After his termination, Mr. Ray initially filed an action in the federal district court alleging violations of the Fair Labor Standards Act ("FLSA"), Colorado's Wage Claim Act, Colorado's Minimum Wage Act, and a common law claim for breach of contract. Dish moved to dismiss, demanding that Mr. Ray arbitrate his claims pursuant to the Agreement. Mr. Ray dismissed the lawsuit and filed with the American Arbitration Association ("AAA"), asserting the same four claims. In addition, and the focus of this case, Mr. Ray attempted to pursue his claims as a class action under Fed. R. Civ. P. 23 and a collective action under 29 U.S.C. § 216(b).
One of the issues presented to the arbitrator was whether the Agreement permitted class arbitration. In his Clause Construction Award, the arbitrator first determined that he had jurisdiction to decide the issue. He reasoned that the determination of whether an arbitration agreement permits classwide arbitration was not a "gateway issue," an issue that is normally decided by courts rather than arbitrators. Gateway disputes include "whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." Green Tree Fin. Corp. v. Bazzle , 539 U.S. 444, 452, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003) (plurality opinion) (citing Howsam v. Dean Witter Reynolds, Inc. , 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) ); John Wiley & Sons, Inc. v. Livingston , 376 U.S. 543, 546-47, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) (a court should decide whether arbitration agreement survived corporate merger and bound resulting corporation); AT&T Techs., Inc. v. Communications Workers of America , 475 U.S. 643, 651-52, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (a court should decide whether labor-management layoff controversy falls within arbitration clause of collective-bargaining agreement). The arbitrator reasoned that even if the issue presented was a "gateway issue," the parties had clearly and unmistakably expressed their intention in the Agreement that questions of arbitrability be resolved by the arbitrator rather than the courts.
After concluding that he had jurisdiction to decide the issue, the arbitrator analyzed the language of the Agreement to determine the parties' intent as to classwide arbitration. Examining six features relevant to that end, the arbitrator ultimately concluded that the Agreement permitted collective action covering Mr. Ray's FLSA and state law claims.
DISH filed with the district court a Petition to Vacate Clause Construction Award, which the court denied. The court agreed with the arbitrator that he had jurisdiction to decide the issue. Although, unlike the arbitrator, the court concluded that the determination of classwide arbitrability was a "gateway issue" normally decided by *1243 the court, it nevertheless held that the Agreement clearly and unmistakably expressed the parties' intention to have the arbitrator resolve such questions. The court also held that the arbitrator did not manifestly disregard the law in interpreting the Agreement. DISH appeals.
II.
DISH first contends that the arbitrator exceeded his powers in determining the gateway issue of jurisdiction over the arbitrability of class and collective claims. It therefore asserts that the normal standard of review usually applicable to an arbitrator's decision, which is extremely deferential, does not apply to the arbitrator's ultimate conclusion here that the Agreement permits classwide arbitrations. DISH also argues that even if the arbitrator did not exceed his powers, his decision manifestly disregarded the applicable law and must therefore be vacated. We address each argument in turn.
A. Class Arbitration as a Gateway Issue
We review a district court's order to vacate or enforce an arbitration award de novo. U.S. Energy Corp. v. Nukem, Inc. , 400 F.3d 822, 830 (10th Cir. 2005). "In doing so, however, we give 'great deference' to an arbitrator's decision." Chevron Mining Inc. v. United Mine Workers of America, Local 1307 , 648 F.3d 1151, 1154 (10th Cir. 2011) (quoting U.S. Energy , 400 F.3d at 830 ). Under the Federal Arbitration Act ("FAA"), vacation of an award is only proper in a few instances that include fraud, corruption, arbitrator misconduct, and arbitrator overreach. 9 U.S.C. § 10(a). Various courts have determined that vacation is also appropriate when the arbitration award violates public policy, when the arbitrator did not conduct a fundamentally fair hearing, or when an arbitrator's decision is "based on a 'manifest disregard' of the law, defined as 'willful inattentiveness to the governing law.' " Chevron Mining , 648 F.3d at 1154 (quoting U.S. Energy , 400 F.3d at 830 ); see also Denver & Rio Grande W. R.R. v. Union Pac. R.R. , 119 F.3d 847, 849 (10th Cir. 1997) (citing cases). Our powers of review have been described as "among the narrowest known to the law." Litvak Packing Co. v. United Food and Commercial Workers, Local Union No. 7 , 886 F.2d 275, 276 (10th Cir. 1989). In fact, "[e]rrors in either the arbitrator's factual findings or his interpretation of the law (unless that interpretation shows a manifest disregard of controlling law) do not justify review or reversal on the merits of the controversy." Chevron Mining , 648 F.3d at 1154 (quoting Denver & Rio Grande , 119 F.3d at 849 ).
But this level of deference only applies to disputes that the parties agreed to submit to arbitration. The Supreme Court has recognized that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Howsam , 537 U.S. at 83, 123 S.Ct. 588 (2002) (quoting United Steelworkers of America v. Warrior & Gulf Nav. Co. , 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ). "Accordingly, the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc. , 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). In making this determination, the Court has "long recognized and enforced a 'liberal federal policy favoring arbitration agreements.' " Howsam , 537 U.S. at 83, 123 S.Ct. 588 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp. , 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ). But the Court "has made clear that there is an exception to this policy: The question *1244 whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability, ' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.' " Id. (quoting AT&T , 475 U.S. at 649, 106 S.Ct. 1415 ).
The Court has distinguished "questions of arbitrability" from what it refers to as mere "procedural questions," "which grow out of the dispute and bear on its final disposition." Id . at 84, 123 S.Ct. 588 (quoting John Wiley , 376 U.S. at 557, 84 S.Ct. 909 ). "They include, for example, issues related to 'waiver, delay,' or 'whether a condition precedent to arbitrability has been fulfilled.' " Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett , 734 F.3d 594, 597 (6th Cir. 2013) (quoting Howsam , 537 U.S. at 84-85, 123 S.Ct. 588 ). This distinction is not always easy to discern, however, and the question of whether an arbitration clause permits classwide arbitration is a gateway dispute for the courts to decide or a procedural question for an arbitrator is an especially baffling one.
In Bazzle , a plurality of the Court stated that whether an agreement permits class arbitration was a procedural question for an arbitrator because "it concerns neither the validity of the arbitration clause nor its applicability to the underlying dispute between the parties." 539 U.S. at 452, 123 S.Ct. 2402. But the Court subsequently noted the non-binding nature of Bazzle in Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp. , 559 U.S. 662, 680, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010) ("In fact, however, only the plurality decided [the classwide arbitrability] question."). As the Court described in Stolt-Nielsen , bilateral arbitration allows "parties [to] forgo the procedural rigor and appellate review of the courts in order to realize" benefits like "lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." Id. at 685, 130 S.Ct. 1758. But these benefits are not realized in classwide arbitration, which gives "reason to doubt the parties' mutual consent to resolve disputes through [it]." Id. ; see also AT&T Mobility L.L.C. v. Concepcion , 563 U.S. 333, 348, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011) ("[T]he switch from bilateral to class arbitration sacrifices the principal advantage of arbitration-its informality-and makes the process slower, more costly, and more likely to generate procedural morass than final judgment.").
Moreover, "[u]nder the Class Rules, 'the presumption of privacy and confidentiality' that applies in many bilateral arbitrations 'shall not apply in class arbitrations,' thus potentially frustrating the parties' assumptions when they agreed to arbitrate." Stolt-Nielsen , 559 U.S. at 686, 130 S.Ct. 1758 (citations omitted). The Court also pointed out that the "commercial stakes of class-action arbitration are comparable to those of class-action litigation," but "the scope of judicial review is much more limited." Id. at 686-87, 130 S.Ct. 1758 (citing Hall Street Assocs., L.L.C. v. Mattel, Inc ., 552 U.S. 576, 588, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008) ). As the Court emphasized in Concepcion , 563 U.S. at 350, 131 S.Ct. 1740 :
The absence of multilayered review makes it more likely that errors will go uncorrected. Defendants are willing to accept the costs of these errors in arbitration, since their impact is limited to the size of individual disputes, and presumably outweighed by savings from avoiding the courts. But when damages allegedly owed to tens of thousands of potential claimants are aggregated and decided at once, the risk of an error will often become unacceptable. Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims.
In light of these Supreme Court cases, many circuits have concluded that whether *1245 an arbitration clause permits classwide arbitration is a gateway dispute for the courts to decide. See, e.g ., Catamaran Corp. v. Towncrest Pharmacy , 864 F.3d 966, 972 (8th Cir. 2017) (holding classwide arbitration determination to be a gateway dispute); Del Webb Communities, Inc. v. Carlson , 817 F.3d 867, 873 (4th Cir. 2016) (same); Opalinski v. Robert Half Int'l Inc. , 761 F.3d 326, 334-35 (3d Cir. 2014) (same); Reed Elsevier , 734 F.3d at 598 (stating "the Court has given every indication, short of an outright holding, that classwide arbitrability is a gateway question rather than a subsidiary one.")
While this issue certainly appears to be advancing in the opposite direction of the concurrence's well-reasoned opinion, we need not resolve it today. Because we conclude below that the parties showed clear and unmistakable evidence of their intention to delegate questions of arbitrability to the arbitrator, "we assume without deciding that one of these gateway matters is whether an arbitration clause authorizes class arbitration." Wells Fargo Advisors, L.L.C. v. Sappington , 884 F.3d 392, 395 (2d Cir. 2018).
B. Clear and Unmistakable Evidence of Delegation
We therefore turn to whether Mr. Ray has shown by clear and unmistakable evidence that the parties intended to delegate this question to an arbitrator. See Howsam , 537 U.S. at 83, 123 S.Ct. 588 ("The question whether the parties have submitted a particular dispute to arbitration, i.e. , the 'question of arbitrability ,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise .' " (alteration in original) (emphasis added) (quoting AT&T , 475 U.S. at 649, 106 S.Ct. 1415 ) ). "Because 'arbitration is simply a matter of contract,' '[j]ust as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question "who has the primary power to decide arbitrability" turns upon what the parties agreed about that matter.' " Belnap v. Iasis Healthcare , 844 F.3d 1272, 1280 (10th Cir. 2017) (alteration in original) (quoting First Options of Chi., Inc. v. Kaplan , 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (citations omitted) ). For the reasons set out below, we conclude that there was clear and unmistakable evidence of delegation here.
Under the parties' broad Agreement, which DISH drafted and required its employees to sign,
any claim, controversy and/or dispute between them, arising out of and/or in any way related to Employee's application for employment, employment and/or termination of employment , whenever and wherever brought, shall be resolved by arbitration .... A single arbitrator engaged in the practice of law from the American Arbitration Association ("AAA") shall conduct the arbitration under the then current procedures of the AAA's National Rules for the Resolution of Employment Disputes ("Rules").
Aplt. App. at 51 (emphasis added). In turn, Rule 6(a) of the Rules provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA, Employment Arbitration Rules and Mediation Procedures (effective Nov. 1, 2009), Rule 6(a). Based on precedent from both this circuit and the state of Colorado, we are persuaded that the broad language of the Agreement and incorporation of the Rules clearly and unmistakably shows the parties intended for the arbitrator to decide all issues of arbitrability.
Our holding in Belnap is instructive. The arbitration agreement in Belnap did not include an incorporation of the AAA Rules *1246 like the agreement in this case, but it did include broad language and incorporation of the JAMS Streamlined Arbitration Rules and Procedure.[1] 844 F.3d at 1281. JAMS Rule 8(c) provides:
Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted and ruled on by the Arbitrator . The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.
Belnap , 844 F.3d at 1281 (quoting JAMS Rule 8(c) ). We held that the parties "clearly and unmistakably agreed to arbitrate arbitrability when they incorporated the JAMS Rules into the Agreement." Id. In reaching this conclusion, we relied on cases from other circuits reaching the same result. See, e.g ., Cooper v. WestEnd Capital Mgmt. L.L.C. , 832 F.3d 534, 546 (5th Cir. 2016) (express adoption of JAMS rules presented clear and unmistakable evidence of agreement to arbitrate arbitrability); Emilio v. SprintSpectrum L.P. , 508 F. App'x 3, 5 (2d Cir. 2013) (same); Wynn Resorts, Ltd. v. Atl.-Pac. Capital, Inc. , 497 F. App'x 740, 742 (9th Cir. 2012) (same). Notably, we also found persuasive multiple cases holding that incorporation of the AAA Rules constituted clear and unmistakable evidence of an agreement to arbitrate arbitrability. Belnap , 844 F.3d at 1283-84 (citing Brennan v. Opus Bank , 796 F.3d 1125, 1130 (9th Cir. 2015) (incorporation of AAA rules constitutes clear and unmistakable evidence that contracting parties agree to arbitrate arbitrability) ); Awuah v. Coverall N. Am., Inc. , 554 F.3d 7, 11 (1st Cir. 2009) (same); Contec Corp. v. Remote Sol., Co. , 398 F.3d 205, 208 (2d Cir. 2005) (same). Belnap thus convinces us that when contracting parties incorporate the AAA rules into a broad arbitration agreement, as was the case here, such an incorporation clearly and unmistakably evinces their intent to arbitrate arbitrability.
Moreover, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts." First Options , 514 U.S. at 944, 115 S.Ct. 1920. Accordingly, Colorado state law necessitates our holding today. Colorado is clear on the effects of incorporating the AAA rules: "[B]y incorporating the AAA Commercial Arbitration Rules into their agreement, the parties authorized the arbitrator to decide arbitrability issues." Ahluwalia v. QFA Royalties, L.L.C ., 226 P.3d 1093, 1099 (Colo. App. 2009).[2] Colorado requires no language more specific than that in the Agreement here to delegate questions of arbitrability to the arbitrator.
DISH contends the district court failed to apply the applicable law by not following *1247 the guidance of multiple circuits that require more specific language delegating the question of classwide arbitrability. See e.g. , Catamaran , 864 F.3d at 973 (requiring "a more particular delegation of the [class arbitration availability] issue than we may otherwise deem sufficient in bilateral disputes"); Chesapeake Appalachia, L.L.C. v. Scout Petroleum, L.L.C. , 809 F.3d 746, 763 (3d Cir. 2016) (requiring "express contractual language unambiguously delegating the question of class arbitrability to the arbitrators" (quotation marks omitted) ); Reed Elsevier , 734 F.3d at 599 (stating that "given the total absence of any reference to classwide arbitration in this clause, the agreement here can just as easily be read to speak only to issues related to bilateral arbitration. Thus, at best, the agreement is silent or ambiguous as to whether an arbitrator should determine the question of classwide arbitrability; and that is not enough to wrest that decision from the courts."). But we disagree with the reasoning of these circuits.
We instead adopt the approach of the Second Circuit in Sappington , 884 F.3d 392. In rejecting the analyses of the Third, Sixth, and Eighth Circuits, the court in Sappington astutely reasoned as follows:
Some of these sister circuits have justified requiring more explicit language to delegate the question of class arbitrability to an arbitrator by explaining that "class arbitration implicates a particular set of concerns that are absent in the bilateral context." Chesapeake, 809 F.3d at 764 ; accord Catamaran, 864 F.3d at 973 (identifying these concerns as "bet-the-company stakes without effective judicial review," "loss of confidentiality," "due process rights of absent class members," "loss of speed and efficiency," and "increase in costs"). These are legitimate concerns. But recall that our inquiry involves two distinct steps: (1) determining whether the question is one of arbitrability presumptively for a court to decide and, if so, (2) determining, on a case-by-case basis, whether there is clear and unmistakable evidence of the parties' intent to let an arbitrator resolve that question. The concerns that some of our sister circuits have identified as unique to class arbitration indisputably relate, in our view, to the first of these steps, that is, determining whether the particular class arbitration availability question is "the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) ; see Catamaran, 864 F.3d at 971 (describing questions of arbitrability as "substantive in nature"); Chesapeake, 809 F.3d at 753 (same); Reed Elsevier, 734 F.3d at 597 (describing questions of arbitrability as "important" and contrasting them with "subsidiary" questions). When, as here, we assume that the class arbitration question is a question of arbitrability and, accordingly, that a court should presumptively answer that question, we still must consider whether there is clear and unmistakable evidence that the parties intended otherwise based on the language of the clause at issue. State law defines how explicit the clause's language must be to satisfy that standard -and Missouri law requires nothing more explicit than the language found in the [parties' arbitration clause].
884 F.3d at 398-99 (emphasis added). That is exactly the situation we have here: whether there is clear evidence of the parties' intent to let the arbitrator decide the issue. The fundamental differences between bilateral and classwide arbitration are irrelevant to us at this second stage of the analysis. Both the precedents from our *1248 circuit and Colorado are straight forward: incorporation of the AAA Rules provides clear and unmistakable evidence that the parties intended to delegate matters of arbitrability to the arbitrator. Accordingly, we conclude the Agreement between DISH and Mr. Ray provides clear and unambiguous evidence that the parties intended to delegate all issues of arbitrability to the arbitrator.[3]
C. Manifest Disregard of the Law
DISH next contends that even if the arbitrator had the authority to determine whether the Agreement permitted classwide arbitration, the Clause Construction Award should be vacated because the arbitrator manifestly disregarded the law or alternatively impermissibly based his decision on public policy. We disagree.
Having held that the arbitrator had the authority to determine the arbitrability of the classwide arbitration issue, our further review becomes extremely limited and is "among the narrowest known to the law." Litvak Packing , 886 F.2d at 276.
Because the parties "bargained for the arbitrator's construction of their agreement," an arbitral decision "even arguably construing or applying the contract" must stand, regardless of a court's view of its (de)merits. Only if "the arbitrator act[s] outside the scope of his contractually delegated authority"-issuing an award that "simply reflect[s] [his] own notions of [economic] justice" rather than "draw[ing] its essence from the contract"-may a court overturn his determination.
Oxford Health Plans L.L.C. v. Sutter , 569 U.S. 564, 569, 133 S.Ct. 2064, 186 L.Ed.2d 113 (2013) (citations omitted). "So the sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." Id.
As the Supreme Court has explained, this question can almost always be answered by simply "summarizing the arbitrator's decisions." Id. at 570, 133 S.Ct. 2064. Here, the arbitrator spent ten pages laboring over this issue and analyzing it in depth. The arbitrator first examined the Agreement's command that the parties arbitrate "any claim, controversy, and/or dispute between them, arising out of and/or in any way related to Employee's application for employment, employment and/or termination of employment." Aplt. App. at 51. After noting Supreme Court precedent holding that the word "any" "has an expansive meaning," United States. v. Gonzales , 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997), the arbitrator reasoned that "[t]he language used here reasonably can be construed as broad enough to suggest that the parties intended to require arbitration of all types of controversies and disputes, including class or collective arbitrations of covered types of claims, related to the signatory employee's employment relationship with DISH." Aplt App. at 40 (citing Sutter v. Oxford Health Plans L.L.C. , 675 F.3d 215, 218, 223 (3d Cir. 2012) (aff'd 569 U.S. 564, 133 S.Ct. 2064, 186 L.Ed.2d 113 (2013) ) ); Jock v. Sterling Jewelers Inc., 646 F.3d 113, 116-17, 126-27 (2d Cir. 2011) ;
*1249 Rame, L.L.C. v. Popovich , 878 F.Supp.2d 439, 449, 453 (S.D.N.Y. 2012).
The arbitrator then pointed out that the Agreement listed six specific exceptions to the broad description of arbitral matters: "in brief, the agreement excludes from arbitrability Employee claims for unemployment compensation, workmen's compensation and ERISA plan benefits, and DISH claims for injunctive relief related to non-competition agreements, intellectual property and confidential company information." Aplt. App. at 41. Noting that there was no such exclusion made for class or collective arbitration proceedings, the arbitrator concluded that this factor also weighed in favor of interpreting the Agreement so as to permit classwide arbitration.
In addition, the arbitrator evaluated the following portion of the Agreement:
The right to a trial, to a trial by jury, and to common law claims for punitive and/or exemplary damages are of value and are waived pursuant to this agreement. Other than potential rights to a trial, a jury trial, and common law claims for punitive and/or exemplary damages, nothing in this Agreement limits any statutory remedy to which the Employee may be entitled under law.
Id . at 51. He reasoned that any interpretation construing the Agreement to exempt classwide arbitration "would limit the exercise of a statutory remedy to which the Employee is entitled under [the] FLSA." Id . at 42. Under the Fair Labor Standards Act ("FLSA"), an employee who is "affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation," can bring an action against the employer "for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). The arbitrator concluded that this feature of the Agreement also weighed in favor of construing it to permit classwide arbitration.
The arbitrator next considered three factors weighing in favor of DISH's argument that the Agreement prohibited classwide arbitration. He first recognized that "[i]f what we want to know is whether the parties mutually intended to authorize arbitration of class or collective proceedings, the fact that their agreement does not expressly or specifically so state must be counted as a factor supporting [DISH's] arguments." Aplt. App. at 44.
The arbitrator then highlighted the numerous references that seemed to contemplate bilateral rather than class proceedings. But he also cited several cases holding that "phrases such as 'you' and 'your employment' do not expressly disclaim collective arbitration proceedings and do not necessarily signal an intent to preclude collective or class arbitration." Id . at 46. The arbitrator concluded that this factor certainly weighed in favor of DISH's interpretation but that it was not dispositive.
Finally, the arbitrator noted the Agreement's requirement that the proceedings be kept confidential:
A single arbitrator engaged in the practice of law from the American Arbitration Association ("AAA") shall conduct the arbitration under the then current procedures of the AAA's National Rules for the Resolution of Employment Disputes ("Rules"). Regardless of what the above-mentioned Rules state, all arbitration proceedings, including but not limited to hearings, discovery, settlements, and awards shall be confidential ....
Id . at 51 (emphasis added). He stated that he "agree[d] with [DISH] that this language indicates an intention of the parties to depart from the AAA's otherwise-applicable rules to the extent necessary to ensure the confidentiality of the proceedings." Id . at 47. However, he ultimately concluded that the confidentiality provision *1250 of the Agreement "d[id] not require an implied limitation on the scope of the parties' Arbitration Agreement to prohibit class arbitrations." Id . at 48.
After analyzing these six features of the Agreement, the arbitrator split his conclusion into two parts. First, he concluded that the Agreement permitted collective arbitration of Mr. Ray's FLSA claims because the first three considerations outweighed the last three discussed above. His conclusion on the state law claims, however, was not so simple:
The record submitted presented a closer case as to whether the Arbitration Agreement, properly construed, was intended to authorize "opt-out" class action arbitration of [Mr. Ray's] Colorado statutory claims or of his breach of contract claim. It is appropriate for the clause construction inquiry to insist on a more explicit expression of mutual intent to permit class arbitration of claims arising under such statutes than with the FLSA claims, where the entitlement to proceed collectively is defined by the underlying statute itself as an integral incident of the "claim" the parties agreed to arbitrate. Applying that standard, I conclude that the language employed by the parties in the Arbitration Agreement creates substantial and legitimate doubt as to whether that agreement was intended to permit or to preclude "opt-out" class arbitration of the state law statutory claims and breach of contract claim. The first three factors discussed above weigh in favor of a conclusion that the parties did intend to permit such class arbitration of those claims, but do so with less force than in the case of the FLSA claims, while the fourth, fifth and sixth factors discussed above weigh against such a conclusion.
Id . The arbitrator ultimately resolved this close call by using the contra proferentem[4] rule of construction:
Application of the other rules of construction counseled by Colorado law have not allowed me to resolve [the ambiguities in the agreement] without significant remaining doubts as to what the parties mutually intended. Accordingly, and as a last resort, I resolve those doubts against the drafter of the Arbitration Agreement - DISH. Accordingly, I conclude that the Arbitration Agreement does permit class arbitration of the [Mr. Ray's] state law statutory and breach of contract claims.
Id. at 49.
We did not summarize the arbitrator's interpretation of the Agreement and his ultimate conclusion because we necessarily agree with him, but rather to show that he interpreted the parties' contract, which is all we are allowed to consider. See Sutter , 569 U.S. at 569, 133 S.Ct. 2064 ("So the sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong."). Here, the arbitrator clearly "considered their contract and decided whether it reflected an agreement to permit class proceedings. That suffices to show that the arbitrator did not 'exceed[ ] [his] powers.' " Id. at 570, 133 S.Ct. 2064 (alteration in original) (quoting 9 U.S.C. § 10(a)(4) ).
DISH's main argument to the contrary is that the arbitrator completely disregarded the Supreme Court's holding in Stolt-Nielsen , 559 U.S. 662, 130 S.Ct. 1758, 176 L.Ed.2d 605. In that case, the Court held that an arbitration panel exceeded its powers under § 10(a)(4) when it ordered a party to submit to class arbitration. But *1251 that case presented a unique factual situation where an arbitration panel determined that an arbitration agreement permitted classwide arbitration even though both parties stipulated that they had not reached an agreement on the issue. Id . at 684, 130 S.Ct. 1758. The Court held that the arbitration panel did not attempt to interpret the contract, but rather, imposed its own policy preference. Id. at 676-77, 130 S.Ct. 1758 ("In sum, instead of identifying and applying a rule of decision derived from the FAA or either maritime or New York law, the arbitration panel imposed its own policy choice and thus exceeded its powers.").
This case is clearly distinguishable from Stolt-Nielsen because Mr. Ray never stipulated that the Agreement is silent as to classwide arbitration. Rather, this case is more like Sutter , where the Court held Stolt-Nielsen inapplicable. 569 U.S. at 571-72, 133 S.Ct. 2064. There, Mr. Sutter entered into a contract with Oxford Health Plans to provide medical care to its patient network. Id . at 566, 133 S.Ct. 2064. The contract included an arbitration clause, but there was no explicit mention of classwide arbitration anywhere in the agreement. Id. The arbitrator held the arbitration clause expressed the parties' intent that class arbitration could be maintained. Id. at 567, 133 S.Ct. 2064. Oxford Health's main contention on appeal was that the arbitrator made the same mistake as the arbitration panel in Stolt-Nielsen and merely imposed its own policy preference. Id. at 571, 133 S.Ct. 2064.
The Court rejected Oxford Health's argument and clarified the holding of Stolt-Nielsen :
In Stolt-Nielsen , the arbitrators did not construe the parties' contract , and did not identify any agreement authorizing class proceedings. So in setting aside the arbitrators' decision, we found not that they had misinterpreted the contract, but that they had abandoned their interpretive role. Here, the arbitrator did construe the contract (focusing, per usual, on its language), and did find an agreement to permit class arbitration. So to overturn his decision, we would have to rely on a finding that he misapprehended the parties' intent. But § 10(a)(4) bars that course : It permits courts to vacate an arbitral decision only when the arbitrator strayed from his delegated task of interpreting a contract, not when he performed that task poorly. Stolt-Nielsen and this case thus fall on opposite sides of the line that § 10(a)(4) draws to delimit judicial review of arbitral decisions.
Id. at 571-72, 133 S.Ct. 2064 (emphasis added). Like the arbitrator in Sutter , the arbitrator here interpreted the contract between the two parties. Regardless of DISH's opinion of the arbitrator's decision or our opinion of the arbitrator's reasoning, the arbitrator did not stray from his delegated task of interpreting the contract. Therefore, his decision must stand.
Finally, DISH argues that the arbitrator completely disregarded Colorado law by ignoring the holding of Medina v. Sonic-Denver T, Inc. , 252 P.3d 1216 (Colo. Ct. App. 2011). DISH contends Medina stands for the proposition that "when an arbitration agreement includes nothing to show that class or collective arbitration is intended to be part of it, it is silent and therefore lacking in the requisite consent for class or collective arbitration." Aplt. Br. at 33. We disagree. In Medina , several employees of Mountain States Toyota attempted to bring a class arbitration claim against Mountain States for unpaid commissions. 252 P.3d at 1218. The arbitration agreement between the employees and Mountain States included a specific waiver of class arbitrations, id. at 1217, but the employees argued that the provision was unconscionable and should therefore be *1252 disregarded, id . at 1218. The court held that it was not necessary to determine the unconscionability issue because if the waiver was unenforceable, the arbitration agreement would be silent as to class arbitration and the parties would therefore have no agreement on the issue. Id . at 1220.
The holding of Medina is a far cry from what DISH proffers. The court in Medina certainly did not hold that an arbitration clause must expressly include an allowance of classwide arbitration or risk running afoul of Stolt-Nielsen . The waivers in Medina allowed the court to skip an analysis of the parties' intent on the issue, a key feature not present here.
In sum, the arbitrator in this case did not manifestly disregard Colorado law when he concluded that he was authorized to conduct class arbitration by the broad language of the Agreement in combination with the requirement that arbitration be conducted pursuant to the AAA's Employment Dispute Rules. Accordingly, the district court correctly denied DISH's petition to vacate the arbitration award.
We AFFIRM.

JAMS stands for Judicial Arbitration and Mediation Services, Inc. It is a company, as the name suggests, that specializes in Arbitration and Mediation services. It has its own set of arbitration rules that can be incorporated into its arbitration agreements, which was the case in Belnap .

DISH tries to distinguish Ahluwalia by arguing that it involved the AAA Commercial Arbitration Rules rather than the Employment Rules, which govern the contract in this case. But both sets of Rules contain almost identical provisions delegating arbitrability disputes to the arbitrator. Compare AAA Commercial Arbitration Rule 7(a) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.") with AAA Employment Arbitration Rule 6(a) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.").

We note DISH's objection to what it describes as the district court declining to follow the binding precedent of Riley Mfg. Co. v. Anchor Glass Container Corp. , 157 F.3d 775, 780 (10th Cir. 1998). There, applying Kansas law, we held that the arbitration agreement at issue did not manifest clear and unmistakable evidence the parties intended the arbitrator to decide issues of arbitrability. However, we never addressed whether incorporation of the Commercial Arbitration Rules of the AAA added clear and unmistakable evidence of delegation, and there is no indication that either party raised this as an issue. Riley is therefore not contrary to our holding here.

"Contra proferentem construes all ambiguities against the drafter." Miller v. Monumental Life Ins. Co. , 502 F.3d 1245, 1253 (10th Cir. 2007).